UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:23-CR-00287-HEA-SPM |
| | ) |
| JASON LEVI MEYRAND, | ) |
| | ) |
| Defendant. | ) |

## REPORT, RECOMMENDATON AND
## MEMORANDUM OPINION CONCERNING
## DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE

All pretrial matters in the above-referenced case have been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). This matter is before the Court on Defendant Jason Levi Meyrand's ("Meyrand") Motion to Suppress Physical Evidence. ECF No. 36.[1]

## BACKGROUND AND PROCEDURAL HISTORY

On May 24, 2023, members of the St. Louis County and Jefferson County Police Departments searched Meyrand's residence pursuant to a search warrant. The search warrant was supported by an affidavit signed by Detective Stephanie Stoehner with the Special Investigations Unit of the St. Louis County Police Department. In the warrant affidavit, Det. Stoehner relied on information she received from a Task Force Officer with Homeland Security Investigations (HSI) in Charlotte, North Carolina. This information included the officer's observations of users in a Kik chat group trading suspected child pornography, screen shots taken by the officer of the same, and user/subscriber and IP address

---

[1] Also pending before the undersigned are Meyrand's Motion to Suppress Statements (ECF No. 37), Motion to Dismiss Count 5 of the Indictment (ECF No. 38), Motion for Bill of Particulars, (ECF 39) and Motion to Inspect Grand Jury Transcripts and Evidence Log (ECF No. 63). The undersigned will address these remaining motions in a separate Report and Recommendation and Order.

information HSI summoned from Kik and Charter Communications. The information provided by Kik and Charter linked Meyrand and his residence to one of the users in the Kik chat group.

On May 31, 2023, a federal grand jury returned an indictment charging Meyrand with four counts of production of child pornography, in violation of 18 U.S.C. §2251(a) (Counts 1-4), and one count of access with intent to view, in violation of 18 U.S.C. §2252A(5)(B). On June 20, 2024, Meyrand filed the instant motion to suppress all fruits of the HSI summonses, including his subscriber and IP information, and all fruits from the search of his home. On September 11, 2024, the undersigned held an evidentiary hearing. Det. Stoehner testified on behalf of the United States. The United States also submitted copies of the HSI summonses issued to Kik and Charter; records/information provided by Kik and Charter in response to the summonses; screen shots from the chat room taken by the HSI Task Force Officer; the affidavit, application, and search warrant for Meyrand's residence; a DVD recording of Det. Stoehner's interview of Meyrand; and a written transcript of the interview. *See* Govt. Exs. 1-7a.

Meyrand offered the testimony of Investigator Brendan Wells with the Federal Public Defender's Office, who testified about the nature and volume of subscriber information HSI summoned. Meyrand also offered into evidence additional records Kik produced in response to the HSI summons; copies of HSI summonses issued to Google and Verizon; records/information Google produced in response to the summons; and a Jefferson County Tactical Operations Order. *See* Deft. Exs. A-F.

At the close of all evidence the undersigned heard oral arguments in support of the parties' respective positions, and the United States offered additional case law not included in its initial briefing. Following the hearing, Meyrand requested, and was granted, time to submit post-hearing briefs. After reviewing the parties' briefs, the undersigned found it necessary to conduct additional research to properly address all issues raised in the suppression motion. With this additional research completed, the matter is now ready for a ruling. After considering the evidence adduced at the hearing, the oral

arguments of counsel, the briefs of the parties, and the applicable law, I make the following findings of fact and conclusions of law.

## I.    FACTUAL FINDINGS

### A.    *The Investigation*

At the time of the evidentiary hearing, Stephanie Stoehner was a Detective in the Special Investigations Unit of the St. Louis County Police Department, where she had been employed for over twelve years ("Det. Stoehner"). As a member of the Special Investigations Unit Det. Stoehner's duties included investigating internet crimes against children as well as human trafficking. Det. Stoehner testified that her investigation of Meyrand began after she was contacted in March of 2023, by Detective Jason Reid, an investigator, and Task Force Officer with Homeland Security Investigations (HSI) in Charlotte, North Carolina ("TFO Reid"). TFO Reid told Det. Stoehner he was investigating a Kik chat room that was being used to distribute images of child pornography. While he was investigating members of the group, TFO Reid determined that one of the members of the Kik chat room, "devillived13," was in Det. Stoehner's area of responsibility—i.e., St. Louis County. Det. Stoehner testified that Det. Reid shared screenshots of video he had captured from the Kik chat room. *See* Govt. Ex. 5. Det. Stoehner also testified that she received copies of summonses HSI issued to Kik and Charter Communications, and information those providers produced in response.

Evidence presented at the hearing shows that on January 18, 2023, HSI issued a summons to Kik c/o MediaLab.ai.Inc. to "appear and/or produce records" pursuant to 19 U.S.C. §1509. Govt. Ex. 1. The summons was issued by "Ronnie Martinez, Special Agent in Charge, Homeland Security Investigations" from Charlotte, North Carolina and stated in relevant part, "Your testimony and/or production of the indicated records is required in connection with an investigation or inquiry . . . to ensure compliance with the laws or regulations administered by CBP and ICE." *See id.* at p.2. The summons also stated it

was "in regard to an investigation involving Child Exploitation and/or transmission of Child Pornography via the internet and requested the following information for eight different Kik user accounts, including "devillived13": Names (including subscriber names); addresses (including mailing addresses, residential addresses and email addresses); "Local and long distance 75 addresses (such as Internet Protocol ("IP" addresses)) associated with those sessions; telephone or instrument numbers; subscriber identity modules; mobile identification numbers; and "other subscriber identities" including "the registration IP address." *Id.* at p. 4. Both Det. Stoehner and Investigator Wells testified that, in asking for IP addresses associated with the sessions, HSI was requesting the IP address generated every time the Kik user logged into the Kik account.

On January 23, 2023, in response to the summons, Kik disclosed subscriber information for "devillived13." *See* Govt. Ex. 2. The response reflected multiple names for the subscriber including "Jason" and "Astro" and multiple last names, including "Meyrand" and "Your savior." *Id.* at p. 1. The response also reflected a possible email address metrojason94@gmail.com. *Id.* The Kik response further reflected that between January 2, 2023, and January 21, 2023, IP address 23.84.81.166 logged into the "devillived13" account around fifty-seven times. *Id.* at p. 3-5.

Evidence presented at the hearing also shows that on February 13, 2023, HSI issued a summons to Charter Communications that, like the summons issued to Kik, was issued by Special Agent Ronnie Martinez and sent pursuant to 19 U.S.C. §1509 in connection with an investigation involving Child Exploitation and/or transmission of Child Pornography via the internet. Govt. Ex. 3. The summons requested disclosure of "any and all subscriber and customer information" including but not limited to physical, billing and email address for IP Address 23.84.81.166 on January 17, 2023, at 2:08:32 UTC. *Id.* at p. 4. On February 22, 2023, Charter responded to the summons indicating, among other things, that the subscriber of IP address 23.84.81.166 at the requested time and date was Jason Levi Meyrand

with a service address of 1677 Wren Drive, High Ridge, MO 63049. Govt. Ex. 3. The response also indicated that the email address metrojason94@gmail.com was associated with the account. *Id.* After receiving the foregoing information from TFO Reid and HSI, Det. Stoehner conducted her own separate investigation into Meyrand.

**B.    *Additional Subscriber and IP Information Obtained by HSI***

**1.    *Expanded IP information from Kik***

Evidence presented at the hearing reflects that, in addition to the records discussed above, Kik produced a more expansive record that showed the IP address for every time Kik user "devillved13" logged into the Kik account between January 23, 2021, and January 17, 2023. *See* Deft. Ex. A. However, it is not clear when that information was provided, and it does not appear Det. Stoehner reviewed or relied on it in her investigation. FPD Investigator, Brendan Wells, testified that, the expanded response from Kik reflected 973 entries of IP data reflecting each time "devillived13" logged into the "devillived13" Kik account over a period of approximately two years. Investigator Wells further testified that the IP addresses reflected in the return from Kik consist of a string of four sets of numbers, with each set of numbers representing different categories of information such as the identity of the internet service provider the user used to access the account during the session (e.g., Charter); the type of device the user used during the session to access the account (such as an iPhone); and where the user was located when he/she accessed the account. Investigator Wells conceded that it is impossible to determine the location from which the user accessed the Kik account by simply looking at the IP addresses reflected in the Kik return. Instead, he indicated that law enforcement would need to take additional steps, such as summoning location information from the internet service provider, to determine the user's location when he accessed the Kik account.

### 2.    *Subscriber and IP Information from Google and Verizon*

Evidence of record also reflects that on February 13, 2023, HSI issued a summons to Google like the summons it issued to Kik. The summons to Google requested similar subscriber information for google account metrojason94@gmail.com. Deft. Ex. B. Google responded to the summons on February 14, 2023, providing subscriber and IP login information. Deft. Ex. C & D. Finally, evidence presented at the hearing reflects that on February 13, 2023, HSI issued a summons to Verizon, like the summons it issued to Charter, requesting information for IP address 174.210.5.220 on January 3, 2023, at 1:43:35 UTC and IP address 174.209.24.207 on January 17, 2023, at 12:43:11 UTC. Deft. Ex. E. The parties did not present any evidence of Verizon's response to the summons.

Although Det. Stoehner testified that she likely received the foregoing additional information summoned from Kik, Google, and Verizon, her testimony suggested that she only relied on information summoned from Kik and Charter and reflected in Govt. Exs. 2 and 4, when she prepared the search warrant affidavit.

### C.    *The Search Warrant*

On May 19, 2023, Det. Stoehner applied for a search warrant for Meyrand's residence at 1677 Wren Drive. Det. Stoehner submitted an affidavit in support of the warrant. In it, Det. Stoehner attested that she had been employed as a police officer for approximately 12 years and was assigned as a Detective to the Division of Criminal Investigations' Special Investigations Unit of the St. Louis County Police Department. Det. Stoehner detailed her training and experience including training from the National Center for Missing and Exploited Children (NCMEC) and Internet Crimes Against Children's Investigative Techniques Training Program. Det. Stoehner attested that the statements in the affidavit were based in part on her personal knowledge or information provided by other law enforcement officers.

The warrant affidavit also attests that Detective Jason Reid is a member of the North Carolina Internet Crimes Against Children (ICA) and a Task Force Officer with Homeland Security Investigations (HSI) in Charlotte, North Carolina. Det. Reid is a certified cyber-crime investigator and has experience with ICAC investigations specifically those involving Kik Messenger. Det. Reid over his career conducted numerous authorized undercover internet operations involving Kik Messenger, leading to the identification, location, and arrest of subjects responsible for the distribution of Child Sexual Abuse Material (CSAM) and/or the sexual abuse of children. Those investigations have identified offenders in the United States as well as in other countries and led to the rescue of numerous children from sexual abuse.

In the warrant affidavit, Det. Stoehner detailed information Det. Reid provided to her on March 2, 2023, related to this investigation of a Kik Messenger group, #loleyecandy. The information provided by Det. Reid showed that on January 11, 2023, he joined a public Kik chat group called "#loleyecandy" (display name: Everything goes 2.0) in an undercover capacity. Based on posts in the chat group, Det. Reid determined the members were using the chat group to exchange child pornography. He began capturing and documenting this activity within the group. On January 16, 2023, a Kik user "devillived13" posted a color image depicting the buttocks of a person believed to be a minor wearing purple shorts or pants that appeared to be pulled down. Numerous files depicting child sexual abuse material were posted both before and after the image posted by "devillived13." "Devillived13" was a member of the Kik group during the time the child sexual abuse material files were posted. Det. Stoehner's affidavit describes images posted in the Kik chat group and captured by Det. Reid between January 16th and January 17th, 2023.

The warrant affidavit attests that HSI sent a summons to Kik c/o MediaLab.ai Inc. for user/subscriber information related to the Kik user "devillived13." In response, Kik sent subscriber

information which showed that the user of "devillived13" was associated with email address "metrojason94@gmail.com." Records from Kik also indicated that the account was repeatedly accessed using Internet protocol (IP) address 23.84.81.166 (hereinafter, Suspect IP address). On February 13, 2023, HSI sent a summons to Charter Communications for user/subscriber information connected with the Suspect IP address. In response, Charter sent records reflecting that the account was actively registered to "Jason Levi Meyrand," with a subscriber address of 1677 Wren Dr., High Ridge, Missouri 63049. Charter's response also provided several email addresses including metrojason94@gmail.com.

The warrant affidavit attests that Det. Stoehner used the information from TFO Reid to conduct a criminal inquiry of Jason Levi Meyrand and learned he was previously convicted of Endangering the Welfare of a Child 1st degree (Sexual Conduct) and Child Molestation 1st degree. Det. Stoehner also obtained Meyrand's Missouri Sex Offender Registration and learned that the email associated with Kik user "devillived13" and address of 1677 Wren Drive were associated with Meyrand. Det. Stoehner also learned that the age of the victim of the offense requiring registration was 10 years old. Finally, Det. Stoehner's affidavit lists several categories of data and other information that law enforcement might expect to find in Meyrand's home based on the crimes under investigation and based on Det. Stoehner's training and experience relative to those crimes.

On May 19, 2023, Det. Stoehner presented the warrant application and supporting affidavit to Judge Tony Manansala in Jefferson County Courthouse. Det. Stoehner was placed under oath by Judge Manansala and swore to the truth of the information contained in her application and supporting affidavit. The judge issued the warrant authorizing law enforcement to search Meyrand's residence for, and if found, to seize:

Photographs, files and graphic images depicting sexual contact or a sexual performance including actual or simulated, normal or perverted acts of human masturbation, deviate sexual intercourse, sexual intercourse or physical contact with or touching of a person's clothed or unclothed genitals, pubic area, buttocks, anus, or the breast of a female in an act of apparent sexual stimulation or gratification and which has as one of its participants or portrays as an observer of such conduct , contact or performance, a child or minor under the age of 18, electronic data processing and storage devices, computers and computer systems including central processing units, internal peripheral storage devices such as fixed discs, external hard discs, floppy discs and diskettes, tape drives and tapes, optical storage devise or other memory storage devices, peripheral input/output devices such as keyboards, printers, video display monitors, optical readers and related communication devices such as modems, routers and other wireless devices; any and all cameras and related equipment, video and audio recorders and all related recording equipment; any and all photographs, copies of photographs and any manufactured hard copy of images related to child pornography; any and all logs containing user names, passwords and documentation or other identifiers necessary to examine or operate items; together with system documentation, operating logs and handwritten notes related to user identifications, passwords and/or child pornography;

And/or online identifiers not registered on the Missouri State Highway Patrol Sex Offender Registration of Jason Levi Meyrand;

*See* Govt. Ex. 6.

### D. *Execution of the Search Warrant*

Det. Stoehner testified that she and seven detectives, one supervisor, and members of the Jefferson County SWAT Team executed the search warrant on May 24, 2023, after initially meeting at a staging location to coordinate the search. The SWAT Team made the initial approach to Meyrand's residence and then later signaled to Det. Stoehner and her team that they could approach the residence. When Det. Stoehner first encountered Mr. Meyrand, he was outside of his residence and in handcuffs. Det. Stoehner requested that the handcuffs be removed by the SWAT Team, and she asked Meyrand to accompany her to her police vehicle for an interview. The handcuffs were removed and Meyrand joined Stoehner in her police vehicle and was interviewed. Other officers conducted the search and ultimately seized incriminating evidence from Meyrand's residence.

## II. CONCLUSIONS OF LAW

Meyrand moves to suppress all physical evidence, including subscriber and IP information HSI summoned from Kik, Charter Communications, Google, and Verizon. Meyrand also seeks suppression of an iPhone, two laptops, data from those devices, and purple pajama pants seized by law enforcement

pursuant to the search warrant executed at his residence on May 24, 2023. In other words, Meyrand seeks to suppress the fruits of the HSI §1509 summonses and the fruits of the search of his residence.

### A. FRUITS OF THE HSI §1509 SUMMONSES

Regarding the fruits of the HSI summonses, Meyrand contends suppression is necessary because HSI's use of §1509 summonses to access his personal information including subscriber and IP addresses violated 19 U.S.C. §1509 and violated his rights under the Fourth and Fifth Amendments.

### 1. VIOLATION OF 19 U.S.C. §1509

Meyrand argues the legislative history and a plain reading of 19 U.S.C. §1509 establish that only people and records related to customs investigations and the illegal importation of goods can be summoned under §1509. *See* ECF No. 36, p. 7-10. Under 19 U.S.C. § 1509(a)(1), "In any investigation or inquiry conducted for the purpose of . . . insuring compliance with the laws of the United States administered by the United States Customs services," the Secretary "(but no delegate of the Secretary below the rank of district director or special agent in charge)" is authorized to

(1) ***examine, or cause to be examined***, upon reasonable notice, ***any record*** (which for purposes of this section, includes, but is not limited to, any statement, declaration, document, or electronically generated or machine readable data) described in the notice with reasonable specificity, which *may be relevant* to such investigation or inquiry.

19 U.S.C. § 1509(a)(1) (emphasis added).

Section 1509(a)(2) authorizes the Secretary (or a "special agent in charge") to "summon" specific categories of people under §1509(a)(2)(A)-(C) and, under §1509(a)(2)(D), the Secretary is authorized to summon "any other person he may deem proper" to appear before the appropriate customs officer at the time and place specified in the summons. These sections authorize the Secretary to require the summoned person to "produce records, as defined in subsection (d)(1)(A), and to give such testimony, under oath, as may be relevant to such investigation or inquiry." 19 U.S.C. §1509(a)(2)(A)-

(D). Subsections 1509(d)(1)(A)(i) and (ii) define "records" that may be summoned to "include" records "required to be kept under section 1508 of this title" or records "regarding which there is probable cause to believe that they pertain to [prohibited merchandise]."

Read together, the foregoing sections of §1509 appear to authorize the issuance of a summons and/or examination of records by a "special agent" of the United States Customs Service in connection with any investigation or inquiry conducted for the purpose of insuring compliance with laws "administered by the United States Customs services." As the United States pointed out in its response, the Homeland Security Act of 2002 shifted the functions of the Customs Service to the Department of Homeland Security, 6 U.S.C. § 203, and divided the Customs Service "into the Bureau of Customs and Border Protection and the Bureau of Immigration and Customs Enforcement." *United States v. Reyeros*, 537 F.3d 270, 274 n.2 (3d Cir. 2008). As a component of ICE, ICE-HSI is part of the Department of Homeland Security. *See id.* As such, ICE-HSI holds the authority of the former Customs Service and § 1509 authorizes ICE-HSI to issue summonses to ensure compliance with the laws of the United States that it administers. *Id.*

Based on the Court's own research, investigating internet-based child pornography and child exploitation crimes appears to be squarely within the purview of ICE-HSI. Pursuant to 6 U.S.C. §473(a)(1)-(2), Congress tasked ICE-HSI with operating a Cyber Crimes Center (referred to as the "Center") whose purpose is to "provide investigative assistance, training, and equipment to support domestic and international investigations of cyber-related crimes." Under §473(b)(1)-(2), Congress directed DHS to maintain a Child Exploitation Investigation Unit within the Cyber Crimes Center that is tasked with coordinating all of ICE's "child exploitation initiatives" including investigations into child pornography and child exploitation.

The factual findings demonstrate HSI complied with the requirements of §1509. In compliance with §1509(a)(1)'s requirement that "no delegate of the Secretary below the rank of district director or special agent in charge" issue a summons, the summonses here were issued by "Ronnie Martinez, Special Agent in Charge, Homeland Security Investigations." *See* Govt. Exs. 1 and 3. Consistent with the authority granted to the Secretary or his delegate to "examine" or "summon" examine people or records to "ensure compliance with the laws or regulations administered by the United States Customs Service" the summonses stated in relevant part, "Your testimony and/or production of the indicated records is required in connection with an investigation or inquiry . . . ***to ensure compliance with the laws or regulations administered by CBP and ICE***" and stated they were being issued "in regard to an investigation involving Child Exploitation and/or transmission of Child Pornography via the internet." *Id.*   Because HSI is tasked by Congress with administering laws pertaining to such investigations, HSI's use of its summons authority under the facts presented here falls squarely within the authority granted under §1509 to "examine any record" and summon "any other person . . . deem[ed] proper" in "any investigation or inquiry conducted for the purpose of . . . insuring compliance with the laws" administered by DHS-ICE-HSI. 19 U.S.C. §§1509(a)(1) and 1509(a)(2)(D).

Meyrand urges a narrow reading of §1509 that, if adopted, would require this Court to ignore language in the very provisions on which Meyrand's arguments rest. For example, Meyrand argues that even if HSI has authority to ***investigate*** internet-based child pornography offenses, §1509(d)(1)(A) prohibits the use of customs summonses to obtain records other than those "required to be kept under section 1508 of this title" or for "which there is probable cause to believe that they pertain to [prohibited merchandise]." ECF No. 36, p. 9-10 ("records may only be summoned if they are 'required to be kept under section 1508' or if there is 'probable cause to believe that [the records] pertain to merchandise the importation of which into the United States is prohibited.'"). Meyrand's proposed interpretation of

§1509(d)(1)(A) would require the Court to ignore the presence of the word "includes".[2] Because the statute's definition of what constitutes "records" to be summoned uses the term "includes," the undersigned construes the list of records that may be summoned under §1509(d) to be a non-exhaustive list that is merely illustrative and not limitative as suggested by Meyrand. *See, e.g., U.S. Bank Nat'l Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 390 (2018) (noting that the word "includes" identifies a non-exhaustive list); *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 578 (1994) (holding that use of the word including is "illustrative and not limitative."); *Ballanger v. Johanns*, 495 F.3d 866, 871 (8th Cir. 2007) (holding that the term "including" is merely illustrative); *P.R. Mar. Shipping Auth. v. I.C.C.*, 645 F.2d 1102, 1112 (D.C. Cir. 1981) ("It is hornbook law that the use of the word 'including' indicates that the specified list of carriers that follows is illustrative, not exclusive.").

Meyrand's suggestion that HSI is not authorized to use the summons authority because §1509 only references the Customs Service seems to ignore the fact that, in the decades since §1509 was promulgated, the United States Customs Service, now known as, DHS-ICE-HSI, has been tasked by Congress with administering laws governing child exploitation and child pornography offenses. Based in part on HSI's statutory directive to investigate child pornography and child exploitation offenses, federal courts that have considered arguments like those raised by Meyrand have uniformly rejected such arguments. *See United States v. Cray*, 673 F. Supp. 2d 1368, 1377 (S.D. Ga. 2009) (rejecting

---

[2] Section 1509(d)(1)(A)(i)-(ii) provides:

(d) Special procedures for third-party summonses

  (1) For purposes of this subsection—
    (A) The term "records" includes those –
        i.  required to be kept under section 1508 of this title; or
        ii.  regarding which there is probable cause to believe that they pertain to merchandise the importation of which into the United States is prohibited.

defendant's argument that a customs summonses are supposed to be used only for administrative purposes related to trade) (citing *Hallock v. United States*, 253 F. Supp. 2d 361, 365 (N.D. N.Y. 2003) (upholding use of § 1509 summons because ICE "has had substantial duties in investigating and serving search warrants upon alleged purveyors of child pornography.")); *United States v. Merrell*, 88 F. Supp. 3d 1017, 1033 (D. Minn. 2015) (upholding use of § 1509 summons after finding that ICE agent was "tasked with investigating violations of [production of child pornography]."), *aff'd on other grounds*, 842 F.3d 577 (8th Cir. 2016); *United States v. McClean,* No. SA-09-CR-270, 2010 WL 376381, at *3 (W.D. Tex. Jan. 25, 2010), *aff'd*, 419 Fed.Appx. 473 (5th Cir. 2011) (holding 19 U.S.C. §1509(a) "authorizes the Customs Service to issue these administrative summons" in connection with suspected child pornography trafficking because "[t]he United States Customs Service is charged with insuring compliance with child exploitation laws," including child pornography offenses); *United States v. Wellbeloved-Stone*, No. 3:17-CR-00014, 2018 WL 1973286 (W.D. Va. April 26, 2018) (rejecting defendant's argument that child pornography-related offenses are "somehow outside the purview of 19 U.S.C. §1509 and the role of HSI" and collecting cases); *see also United States v. Fletcher*, 763 F.3d 711, 713 (7th Cir. 2014) (recognizing that "Immigration and Customs Enforcement ('ICE') Special Agents [ ] are experts in investigating child exploitation offenses."). Meyrand has cited no cases supporting his preferred interpretation of § 1509 and the undersigned has found no such cases. The undersigned declines to adopt the statutory interpretation urged by Meyrand.

For the foregoing reasons, Meyrand has failed to show that, under the facts presented here, HSI violated §1509.

## 2. FOURTH AMENDMENT VIOLATION

Meyrand argues HSI's use of §1509 summonses to obtain his subscriber and IP address information from Kik, Charter and other internet providers violated his Fourth Amendment rights. *See*

ECF No. 36, p. 10-14. The "touchstone" of Fourth Amendment analysis is whether the individual has a reasonable expectation of privacy in the area searched, i.e., "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 177, 182-83 (1984); *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (a search occurs for purposes of the Fourth Amendment "when the government violates a subjective expectation of privacy that society recognizes as reasonable"). The Fourth Amendment does not prohibit Government authorities from obtaining "information revealed to a third party . . . even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."   *United States v. Wheelock*, 772 F.3d 825, 829 (8th Cir. 2014) (holding defendant cannot claim "a reasonable expectation of privacy in the government's acquisition of his subscriber information, including his IP address and name from third-party service providers"); *United States v. McIntyre,* 646 F.3d 1107, 1111 (8th Cir. 2011) (rejecting defendant's argument that he had an expectation of privacy in electricity usage records for his residence because the records contained intimate details about the interior of his home). *See also Smith v. Maryland*, 442 U.S. 735, 743–44 (1979); *United States v. Miller*, 425 U.S. 435, 443 (1976). Because HSI obtained Meyrand's subscriber and IP information from third-party service providers, this principal, known as the third-party doctrine, appears to be dispositive of Meyrand's claim that he has a reasonable expectation of privacy in the subscriber information HSI summoned.

The Eighth Circuit and other federal circuit courts of appeal have repeatedly held that subscriber information disclosed during ordinary use of the internet, including internet protocol addresses and email addresses, falls within the third-party doctrine. *Wheelock*, 772 F.3d at 828–29*; United States v. Perrine*, 518 F.3d 1196, 1204–05 (10th Cir. 2008) (collecting decisions); *United States v. Christie*, 624 F.3d 558, 573–74 (3d Cir. 2010); *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010); *United*

*States v. Weast*, 811 F.3d 743, 747–48 (5th Cir. 2016); *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001); *United States v. Caira*, 833 F.3d 803, 806–09 (7th Cir. 2016); *United States v. Corbitt*, 588 F. App'x 594 (9th Cir. 2014). However, Meyrand argues that the Supreme Court's decision in *Carpenter v. United States,* 585 U.S. 296, 309-310 (2018), casts doubt on those earlier decisions.

In *Carpenter,* law enforcement officers obtained Carpenter's cell-site records from wireless carriers pursuant to a subpoena under the Stored Communications Act, 18 U.S.C. §2703(d). *Id.* at 302. Carpenter later moved to suppress cell-site data provided by the wireless carriers, arguing that the government violated the Fourth Amendment by seizing records without a warrant supported by probable cause. *Id.* The government argued the third-party doctrine was dispositive because cell-site records are "business records," created and maintained by wireless carriers. *Id.* at 298. The Court rejected the government's argument and held Carpenter had a "legitimate expectation of privacy in the record of his physical movements as captured through CSLI [cell-site location information]." *Id.* at 310.

In so holding, the Court reasoned that the "the ability to chronicle a person's past movements through the record of his cell phone signals" is a "new phenomenon" in Fourth Amendment jurisprudence. *Id.* at 309. The Court held the specific digital data before it—"personal location information maintained by a third party"—did not "fit neatly under existing precedents but [laid] at the intersection of two lines of cases. One set addresses a person's expectation of privacy in his physical location and movements. The other addresses a person's expectation of privacy in information voluntarily turned over to third parties." *Id.* at 297 (internal citations omitted). The Court observed that the chronicling of a person's movements through cell phone signals is "detailed, encyclopedic, and effortlessly compiled," like GPS tracking of a vehicle. *Id.* at 309. The Court also noted that the accuracy of data "is rapidly approaching GPS-level precision," *id.* at 313, many cell sites can "pinpoint a phone's location within 50 meters." *Id.* The Court further observed that cell phone users do not share their cell

site location information voluntarily, instead, cell phones generate cell-site location information "without any affirmative act on the part of the user," and users have no way to stop data collection other than making the phone useless by disconnecting it from the network. *id.* at 314-15. The Court reasoned "the notion that an individual has a reduced expectation of privacy in information knowingly shared with another" or that an individual has engaged in "voluntary exposure" merely by his or her physical movements with a cell phone extends the third-party doctrine too far. *Id.* at 310. The Court ultimately concluded that the digital data before it was less like information a person voluntarily turns over to a third party (such as name, address, and other information necessary to conduct business) and more like GPS tracking data that, although maintained by a third party, is collected without any affirmative act on the part of the person being tracked and is maintained in a way that implicates a person's expectation of privacy in his physical location and movements.

Meyrand asserts the third-party doctrine does not apply because the subscriber and IP information at issue here is analogous to the cell site location data at issue in *Carpenter.* This argument lacks merit for several reasons. First, Meyrand has not even attempted to explain how or why personal information such as his name, telephone number, physical address, and email address HSI summoned from Charter might even remotely compare to "detailed, encyclopedic, and effortlessly compiled" records that chronicle a person's movement over time. *Carpenter,* 585 U.S. at 309. The undersigned finds that the subscriber information disclosed by Charter is precisely the type of business record that falls within the third-party doctrine.

Second, testimony of Det. Stoehner and Investigator Wells demonstrated that the IP addresses summoned by HSI were generated only when the user accessed the Kik user account "devillived13." This distinguishes the IP address logs in this case from the CSLI in *Carpenter*, which the Court noted was generated "without any affirmative act on the part of the user." *Carpenter,* 585 U.S. at 314-15. The

fact that IP address logs are generated only with the user's affirmative interaction with the third-party internet service provider makes these records more like the type of information a person turns over to a service provider, such as name, address, and other information necessary to conduct business. Such information has historically been afforded no Fourth Amendment protection under the third-party doctrine.

Finally, unlike the CSLI in *Carpenter*, the IP logs do not effortlessly or even necessarily convey location information. Investigator Wells testified that the IP addresses reflected in the return from Kik contained four sets of numbers that represent different categories of information such as which internet service provider the user was using to access the account during a session (e.g., Charter), what type of device the user was using to access the account (such as an iPhone), and the location from which the user was accessing the account. Investigator Wells conceded that it was impossible to determine the location from which the user accessed the Kik account by simply looking at the IP addresses reflected in the Kik return. Instead, he indicated additional steps, such as summoning location information from the internet service provider, would be needed to determine the user's location when accessing the Kik account. The IP address information summoned by HSI falls outside *Carpenter*'s narrow exception to the third-party doctrine because, based on the facts of this case, it "can be translated into location information only indirectly, by examining the internet company's business records to determine the physical address where the network is registered" *United States v. Trader,* 981 F.3d 961, 968 (11th Cir. 2020) (citing *United States v. Hood,* 920 U.S. 87, 92 (1st Cir. 2019).

Federal courts have consistently rejected arguments like Meyrand's that try to shoehorn IP address information into the "narrow" exception the Supreme Court carved out for CSLI in *Carpenter*. *See Carpenter,* 585 U.S. at 316 (noting that the Court's holding is "narrow"). As the Eleventh Circuit observed in *Trader,* "every federal court to consider the question" since *Carpenter* has distinguished

between an IP address and CSLI and has held that IP address logs are subject to the third-party doctrine. *Trader,* 981 F.3d at 968 (denying motion to suppress because IP address does not "directly record an individual's location"); *United States v. Morel,* 922 F.3d 1, 9 (1st Cir. 2019) (rejecting defendant's argument that, under *Carpenter,* the third-party doctrine does not apply to IP address information because "unlike CSLI information, IP address information on its own does not provide information concerning location"); *United States v. Wellbeloved-Stone,* 777 F. App'x 605, 607 (4th Cir. 2019), *cert. denied,* 140 S. Ct. 876 (2020) (holding defendant "had no reasonable expectation of privacy in his IP address or subscriber information"); *United States v. VanDyck,* 776 F. App'x 495, 496 (9th Cir. 2019) (declining to extend *Carpenter* to encompass subscriber information associated with IP address where court previously held defendant had "no expectation of privacy in the IP addresses of the websites he visited"); *United States v. Contreras,* 905 F.3d 853, 857 (5th Cir. 2018) (holding IP address data fit "comfortably within the scope of the third-party doctrine"). *See also United States v. Herrington,* No. 2:20-cr-00040, 2021 WL 3487992 *1, 5 (D. Vermont, August 9, 2021) (defendant failed to establish a reasonable expectation of privacy in his IP address logs).

Although the Eighth Circuit has not squarely addressed the question of whether *Carpenter* excludes IP address information from the third-party doctrine, in *United States v. Shipton,* 5 F.4th 933, 936 (8th Cir. 2021), the Eighth Circuit hinted that it agreed with *Trader* and other circuit courts that have addressed the question. In *Shipton,* the issue was whether recent Supreme Court decisions called into question the Eighth Circuit's prior decisions regarding a defendant's reasonable expectation of privacy on a public peer-to-peer network. After making clear that "nothing in *Carpenter, Riley, or Jones* calls into question our oft-repeated observation that a defendant has no reasonable expectation of privacy in materials he shared on a public peer-to-peer network," the Eighth Circuit held "[o]ur sister circuits have rejected similar attempts by online traders in child pornography to use *Carpenter, Riley,*

and *Jones* to demonstrate a reasonable expectation of privacy in things such as a user's IP address and other subscriber information." *Id.* (*citing United States v. Trader,* 981 F.3d 961, 967-68 (11th Cir. 2020)).

In sum, based on the factual findings and the current state of the applicable law, Meyrand did not have a reasonable expectation of privacy in his subscriber information summoned from Charter or in the IP addresses summoned from Kik and the other third-party service providers. As such, his Fourth Amendment rights were not implicated when HSI used a summons under 19 U.S.C. §1509 to obtain that information.

### 3.  FIFTH AMENDMENT DUE PROCESS VIOLATION

Meyrand argues suppression is necessary even if the Court finds that he has no Fourth Amendment interest in his subscriber or IP information because DHS-HSI has not acted in good faith and because HSI's use of §1509 summonses implicates Meyrand's Fifth Amendment right to due process. ECF No. 36, at p. 5-17. Specifically, Meyrand argues it was an abuse of process for HSI to use a summons intended for civil/administrative purposes to gather information in a criminal case. Meyrand cites *Abel v. United States,* 362 U.S. 217, 226 (1960) and *United States v. Genser,* 582 F.2d 308 (3rd Cir. 1978) in support of this position. Meyrand's reliance on *Abel* and *Genser* is misplaced.

The defendant in *Abel* was tried for conspiracy to commit espionage. Prior to trial he attempted, unsuccessfully, to have seven items that were seized by law enforcement officers without a search warrant suppressed. *Abel,* 362 U.S. at 219. The seizures did not occur because of any criminal process against the defendant; instead, they arose out of his administrative arrest by the United States Immigration and Naturalization Service ("INS") for possible deportation. *Id.* Defendant argued suppression was justified because the INS warrant was used as a sham to place defendant in custody pending a determination of his deportability so that a different agency, the FBI, might pressure him into

confessing and cooperating with their espionage investigation. *Id.* at 225-26. Defendant also argued the administrative arrest was a sham to allow the government to search through his belongings for evidence of espionage without a warrant. *Id.*

On appeal, the Supreme Court considered whether alleged abuse of an INS administrative warrant violated the defendant's rights under the Fourth and Fifth Amendment. *Id.* at 219. The Supreme Court held the record below supported the lower courts' rulings that while the two agencies may have cooperated with each other, defendant's administrative arrest was not, as defendant contended, a sham. *Id.* Thus, the Court concluded no constitutional violation arose from defendant's arrest on an administrative warrant. *Id.* at 226. In so holding, the Court noted as dicta, "[w]ere this claim justified by the record, it would indeed reveal a serious misconduct by law-enforcing officers. The deliberate use by the Government of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts. The preliminary stages of a criminal prosecution must be pursued in strict obedience to the safeguards and restrictions of the Constitution and laws of the United States." *Id.*

*Abel* does not support Meyrand's argument for suppression based on a Fifth Amendment abuse-of-process violation. At the time *Abel* was decided, the Attorney General or his delegate was authorized to arrest aliens pending deportation proceedings under an administrative warrant, not a judicial warrant within the scope of the Fourth Amendment, pursuant to §252(a) of the Immigration and Nationality Act of 1952. *Id.* at 232. *See also United States v. Clarke,* 110 F.3d 612, 614 (8th Cir. 1997) (calling into question the "continued validity of *Abel* in light of *Whren v. United States,* 517 U.S. 806 (1996)). As such, the warrant in *Abel* could not be "employed as an instrument of criminal law enforcement to circumvent the latter's restrictions." *Id.* at 230. The same is not true of the statute at issue in this case.

Unlike the INS administrative warrant in *Abel*, as discussed above, the process at issue in this case—a §1509 summons—can be "employed as an instrument of criminal law enforcement." *See id.* Section 1509 authorizes the issuance of a summons and/or examination of records by a "special agent in charge" of the United States Customs Service in connection with any investigation or inquiry conducted for the purpose of insuring compliance with laws "administered by the United States Customs service." The Homeland Security Act of 2002 shifted the functions of the Customs Service to the Department of Homeland Security, 6 U.S.C. § 203, and divided the Customs Service "into the Bureau of Customs and Border Protection and the Bureau of Immigration and Customs Enforcement." *Reyeros*, 537 F.3d at 274 n.2. HSI is a component of ICE and holds the authority of the former Customs Service. *Id.* Pursuant to 6 U.S.C. §473(a)(1)-(2), Congress tasked ICE-HSI with proving "investigative assistance, training, and equipment to support domestic and international investigations of cyber-related crimes." Under §473(b)(1)-(2), DHS is also tasked with coordinating all of ICE's "child exploitation initiatives" including investigations into child pornography and child exploitation through its Cyber Crimes Center. As such, HSI is specifically authorized to investigate child pornography and child exploitation related crimes and is therefore authorized to issue §1509 summonses in connection with those statutory duties.

Meyrand's reliance on *Genser* is also unavailing. Defendants in *Genser* unsuccessfully sought suppression of evidence the government obtained through IRS administrative summonses issued pursuant to 26 U.S.C. §7602. *Genser*, 582 F.2d at 294-95. The defendants argued the summonses were unlawful because prior Supreme Court decisions held that a §7602 summons by the IRS "may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution." *Id.* at 300. Before trial the defendants repeatedly requested an evidentiary hearing to determine whether the IRS had complied with the statutory requirements. *Id.* However, those requests were denied. On appeal, the Third Circuit reviewed existing precedent and held the IRS may not "in

good faith, by means of §7602 summonses gather evidence solely for a criminal investigation." *Id.* The
court remanded the case to the district court with instructions to "conduct an evidentiary hearing and to
certify its findings of fact and conclusions of law as to whether the government fully complied with the
requirements of 26 U.S.C. §7602, as judicially interpreted, and if not, whether suppression is required."
*Id.* at 311.

The judicially imposed limitations on the IRS's ability to issue §7602 summonses in *Genser* are
simply not present in this case. To the contrary, as discussed above, federal courts have uniformly
rejected the arguments, raised here by Meyrand, that HSI is prohibited from issuing §1509 summonses
in child exploitation investigations.

### 4.   THE EXCLUSIONARY RULE

For all the foregoing reasons, Meyrand has failed to demonstrate that the facts of this case justify
application of the exclusionary rule to suppress the fruits of HSI's §1509 summonses. "Under [the
exclusionary] rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal
proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S.
338, 347 (1974). This prohibition "reaches not only primary evidence obtained as a direct result of an
illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or
fruit of the poisonous tree." *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012) (internal
quotation omitted). The rule operates as "a judicially created remedy designed to safeguard Fourth
Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the
party aggrieved." *Calandra,* 414 U.S. at 348.

The Supreme Court has long held that exclusion does not necessarily follow every Fourth
Amendment violation, rather, the exclusionary rule is applied in limited circumstances: "those 'unusual
cases' " where it may "appreciably deter governmental violations of the Fourth Amendment." *U.S. v.*

*Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (citing *U.S. v. Leon*, 468 U.S. 897, 909, 104 S.Ct. 3405, 82

L.Ed.2d 677 (1984)); *see also Hudson v. Michigan,* 547 U.S. 586, 591-92, 126 S. Ct. 2159, 2164 (2006)

(whether suppression is appropriate is a separate question from whether a defendant's Fourth

Amendment rights were violated). In deciding the exclusionary rule's applicability, courts weigh the

benefits of the deterrent effect against the social costs of exclusion. *Herring v. United States*, 555 U.S.

135, 141 (2009).

Although exclusion is a proper remedy for some Fourth Amendment violations, the exclusionary

rule is, generally, not applicable to statutory violations. *See Herring,* 555 U.S. at 139–40 (citing

*Calandra*, 414 U.S. at 348) (the exclusionary rule is "designed to safeguard Fourth Amendment rights

generally through its deterrent effect.")); *see also Davis v. United States*, 564 U.S. 229, 237–38 (2011)

(finding "heavy toll" of suppression appropriate only when law enforcement officials act in "

'deliberate,' 'reckless,' or 'grossly negligent disregard for Fourth Amendment rights.'"). In the "few

cases" where the Supreme Court has suppressed evidence based on a statutory violation,

they have done so because "the excluded evidence arose directly out of statutory violations that

implicated important Fourth and Fifth Amendment interests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331,

348 (2006) (quoting *Herring*, 555 U.S. at 144).

"[T]he burden of proof is on the defendant who seeks to suppress evidence." *U.S. v. Johnson*, 63

F.3d 242, 245 (3d Cir. 1995) (citation omitted). "[O]nce the defendant has established a basis for his

motion, *i.e.*, the search or seizure [implicates Fourth Amendment interests and] was conducted without a

warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.*

(citation omitted). Meyrand has failed to make a threshold showing that HSI committed a constitutional

violation or statutory violation that implicated important Fourth or Fifth Amendment interests. Meyrand

has also failed to establish that HSI engaged in any type of deliberate and repeated statutory violation

that might justify application of the exclusionary rule. Meyrand's evidence of systemic overreach by DHS-HSI included a report concerning a 2017 Complaint filed by Twitter against Customs and Border Patrol as evidence of systemic overreach by DHS-HSI. *See* ECF No. 36, at p. 6-7. However, as the United States noted in its response, the report cited by Meyrand does not involve HSI or its use of the summons authority under §1509 in connection with child exploitation investigations. ECF No. 48, at p. 5-6.

In fact, based on the record before this Court, TFO Reid, Det. Stoehner, and HSI were reasonable in their belief that HSI was authorized to issue summonses under §1509. As discussed above, §1509 has language authorizing HSI to "examine" or "summon" records and persons for the purpose of ensuring "compliance with the laws of the United States administered by HSI" and, under 6 U.S.C. §473, Congress has tasked ICE-HSI with coordinating all of ICE's "child exploitation initiatives" including investigations into child pornography and child exploitation. Even if HSI was mistaken about the propriety of using §1509 summonses in child exploitation investigations, such a mistake seems reasonable considering the plethora of opinions from federal courts holding that HSI indeed has that authority in child pornography cases.

In sum, the record before this Court does not support a finding that application of the exclusionary rule would serve the rule's remedial objectives. *See United States v. Hamilton,* 591 F.3d 1017, 028 (8th Cir. 2010) ("the exclusionary rule applies only where its remedial objectives are thought most efficaciously served"). As such, Meyrand's motion to suppress the fruits of HSI's §1509 summonses, including subscriber and IP information, lacks merit and should be denied.

### B.    FRUITS OF THE RESIDENTIAL SEARCH WARRANT

Meyrand contends the fruits of the search of his residence, including devices, data, and a pair of purple pajama pants, must also be suppressed. "The Fourth Amendment requires that search warrants be

issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (internal quotations omitted). In *Dalia*, the Supreme Court explained that valid warrants "require only three things." *Id.* "First, warrants must be issued by neutral, disinterested magistrates." *Id.* (citations omitted). Second, the warrant may issue only upon a showing of "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense." *Id.* (*quoting Warden v. Hayden*, 387 U.S. 294, 307 (1967)). Third, the warrant "must particularly describe the things to be seized as well as the place to be searched." *Id.* (citations and quotations omitted). Requiring particularity protects the citizens against general warrants. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1972), *overruled in part on other grounds by Horton v. California,* 496 U.S. 128 (1990); *see also Ashcroft v. Al-Kidd*, 563 U.S. 731, 742-43 (2011) ("The principal evil of the general warrant was addressed by the Fourth Amendment's particularity requirement.").

Meyrand does not challenge the neutral, disinterested magistrate requirement. Meyrand also does not suggest that, as issued, the warrant lacked probable cause. However, Meyrand argues the search warrant was tainted by HSI's unlawful collection of subscriber and IP information, and, without the tainted information, the search warrant lacks probable cause. ECF No. 36, at p. 17. Meyrand also contends the warrant was invalid because it did not particularly describe the place to be searched and the things to be seized. *Id.* at p. 17-20. The Court will address each argument in turn.

### 1. THE SEARCH WARRANT WAS NOT TAINTED

Meyrand's argument that the search warrant was tainted by HSI's unlawful collection of subscriber and IP information is foreclosed by this Court's previous finding that HSI did not violate either §1509 or the Constitution when it obtained Meyrand's subscriber and IP address information. Meyrand does not suggest that the warrant otherwise lacked probable cause and the Court finds, based on the totality of the

circumstances set out in the search warrant affidavit, that the issuing judge had a "substantial basis for concluding that probable cause existed." the warrant was supported by probable cause. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). *See also United States v. Bieri*, 21 F.3d 811, 815 (8th Cir. 1994) (holding probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched"); *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (holding that "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause") (quoting *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982)).

## 2.  THE SEARCH WARRANT DID NOT LACK PARTICULARITY

"The particularity requirement [of the Fourth Amendment] prohibits officers 'from conducting general, exploratory rummaging of a person's belongings.'" *United States v. Shrum*, 59 F.4th 968, 973 (8th Cir. 2023) (quoting *United States v. Sigillito*, 759 F.3d 913, 923 (8th Cir. 2014)). Courts evaluate compliance with the particularity requirement according to "a standard of 'practical accuracy' rather than a hyper technical one." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (quoting *United States v. Peters*, 92 F.3d 768, 769-70 (8th Cir. 1996)). "To satisfy the particularity requirement of the [F]ourth [A]mendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Sherman*, 372 F. App'x 668, 675 (8th Cir. 2010) (quoting *Summage*, 481 F.3d at 1079). The items to be seized "must be described with sufficient particularity as to enable the searcher to locate and identify the ... items with reasonable effort and to avoid mistakenly ... seizing the wrong items." *United States v. Gleich*, 397 F.3d 608, 611 (8th Cir. 2005). The requisite specificity of a warrant depends upon "such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances

surrounding the case." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (quoting *Milliman v. Minnesota*, 774 F.2d 247, 250 (8th Cir. 1985)).

Here, the warrant authorized law enforcement to search Meyrand's residence. The primary purpose of the warrant was to search the property for child pornography and evidence that Meyrand failed to register as a sex offender. The warrant describes in detail the types of photographs, files, images, digital storage and other devices, officers executing the warrant were authorized to seize and the warrant affidavit lays out the history of the investigation and, based on Det. Stoehner's experience and training, the types of data and information officers could potentially find in Meyrand's residence related to the crimes under investigation. Despite the level of detail in the warrant, Meyrand argues the warrant was overbroad because it did not limit the search to photographs, files, and images created within a particular timeframe. ECF No. 36, at p. 19. Meyrand cites *United States v. Winn,* 79 F.Supp.3d 904 (S.D. Ill. 2015) in support of this argument. ECF No. 19.

As the United States pointed out in its response, *Winn* is distinguishable. The defendant in *Winn* was charged in state court with one misdemeanor count of public indecency after taking photographs with his cell phone of 13 and 14 year old girls at a public swimming pool on a single day. *Winn,* 79 F. Supp.3d at 912. Based on data extracted from his cell phone, Winn was also charged with twenty-one felony counts of child pornography and three felony counts of unlawful videotaping of a minor. *Id.* After the case was transferred to federal court, Winn filed a motion to suppress data seized from his cell phone arguing, among other things, that the search warrant authorizing a search of his phone lacked particularity. *Id.*

The court sided with Winn. Noting that the warrant "authorized the seizure of virtually every piece of data that could conceivably be found on the phone," the court reasoned that "in the case of a misdemeanor crime [like the crime the warrant was issued for], it is difficult to fathom why the police

would ever need, or have probable cause to [seize such an expansive array of data from a cell phone]."
*Id.* at 919. The court further held that based on the probable cause statement submitted in support of the warrant, "there was probable cause to believe that only two categories of data could possibly be evidence of the crime: photos and videos." *Id.* The court further observed:

> The complaint did not offer any basis—such as facts learned during the investigation or Detective Lambert's training and expertise—to believe that the calendar, phonebook, contacts, SMS messages, MMS messages, emails, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, or system files were connected with Winn's act of public indecency. In fact, the narrative portion of the complaint did not even mention those categories of data.

*Id.* at 919-20.

The *Winn* court held that the warrant was overbroad given the affiant's failure to explain how and why each type of data the warrant authorized was connected to Winn's criminal activity. *Id.* at 920. The court held, "[m]ost importantly, the warrant should have specified the relevant time frame" because the alleged criminal activity took place on one day only; police were looking for photos or videos taken that same day; and there was "nothing in the complaint indicating that any data created prior to that date was connected to the suspected public indecency." *Id.*

Based on the factual findings above, the warrant here case does not suffer from the deficiencies addressed by the court in *Winn.* Unlike the single day misdemeanor conduct under investigation in *Winn*, the affidavit here established that the username "devillived13" was part of a Kik group that an HSI Task Force Officer observed trading child pornography over several days. Det. Stoehner's affidavit also provided probable cause to search for and seize a broad category of digital and other data from Meyrand's home. For example, Det. Stoehner's affidavit attested, based on training and experience, that persons involved with child pornography/child exploitation communicate with others through digital and other written correspondence; computers used to access the internet contain files, logs, and/or remnants

establishing ownership or use of the device and use of internet service accounts used to access the internet; files related to child pornography obtained from the internet leave files, logs, and/or file remnants which show the exchange, transfer, distribution, or possession of the files; and people who collect child pornography tend to keep files for extended periods of time.

In sum, for the reasons stated above, after considering "the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case," the undersigned finds the warrant satisfied the particularity requirement. *See Fiorito*, 640 F.3d at 346.

## CONCLUSION

For the foregoing reasons, Meyrand has failed to demonstrate a basis for suppressing either the fruits of HSI's §1509 summonses and/or the fruits of the search of his residence.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Jason Levi Meyrand's Motion to Suppress Physical Evidence [ECF No. 36] be **DENIED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated: January 13, 2025.